UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DONALD MONTANA,

                              Petitioner,

          -vs-                                          **No. 03-CV-6643(CJS)(VEB)**


JAMES T. CONWAY, Superintendent        **REPORT & RECOMMENDATION**
of Attica Correctional Facility,

                              Respondent.
_____

## I.        Introduction

          Donald Montana ("Montana" or "petitioner") seeks a writ of habeas corpus, pursuant to

28 U.S.C. § 2254, vacating his convictions on murder in the second degree and robbery in the

First degree after a jury trial in Niagara County Court. United States District Judge Charles J.

Siragusa has referred the matter to the undersigned for the issuance of a Report and

Recommendation on the disposition on Montana's petition. For the reasons that follow, this

Court recommends that Montana's petition be denied and this action be dismissed.

## II.       Factual Background and Procedural History

          The conviction Montana challenges here on habeas review arose from his involvement in

the robbery and murder of Joseph Greene ("Greene" or "the victim") at Greene's residence in the

City of Niagara Falls on the evening of March 5, 2000.  At about 9:30 p.m., a neighbor

discovered Greene lying on the sidewalk at the bottom of the stairwell leading to his apartment,

bleeding from the head. His pockets were turned inside out, and items of his personal property

were scattered on the ground around him.  Greene later died at the hospital as a result of head

injuries. Montana and co-defendant Charles "Chuck" Rogers ("Rogers") were apprehended later that night by the police and arrested. Montana made a statement placing himself and at the crime scene. He said that they saw Greene lying unconscious on the ground and decided to rob him. Montana admitted that they took money from Greene's pockets but he denied having had anything to do with the murder. On March 21, 2000, the grand jury returned an indictment charging Montana and Rogers with murder in the second degree (N.Y. Penal Law § 125.25(3) (felony murder)) and robbery in the first degree (N.Y. Penal Law § 160.15(1)). Montana was tried separately from Rogers before a jury in October 2000, in Niagara County Court (Broderick, J).

Tim Wooten ("Wooten") testified for the prosecution that the night of the murder, March 5, 2000, was his 40th birthday. At about 8 p.m., he saw cab pull up next to his apartment. The cab driver, James Weaver ("Weaver"), knocked on Wooten's door a moment later and asked Wooten if he knew the address of the passenger sitting in the cab, who was "slooped [sic] over with his hair over his head." T.1111-12.[1] While Wooten was speaking with the cab driver, he saw two black males wearing "dark clothing" standing on the porch of 1510 Ashland Avenue, the apartment where his friend Amber Stone lived. T.1114, 1197. After recognizing Greene slumped over in the backseat, Wooten walked over to the house of neighbor Joanne Scott ("Scott") and asked her fifteen-year-old son, James Marrero ("Marrero"), to help the cab driver with Greene. T.1112-13. Wooten returned to his apartment and, about fifteen minutes later, heard a lot of sirens outside. T.1115.

When Marrero went over and looked inside the cab, he saw Greene who smelled of

---

[1]        Citations to "T.__" refer to the trial transcript.

alcohol and "looked drunk." T.1129. Marrero also noticed "two black guys on Amber [Stone]'s porch," and they "were laughing at Joe." T.1130, 1131. Marrero said to them, "[I]t's not funny," but they "were still laughing." T.1132. One man "had braids with a bandana on with all black clothes." T.1132. The other man "had a bandana with dark clothes, too." T.1132. Marrero recalled that he had seen the one with braids before at Stone's apartment. T.1132-33. Weaver, the cab driver, also noticed a black male standing on the porch next door; this individual was "watching every move that [they] were making and what the neighbors were doing and stuff like that to help [the victim] to get to his apartment." T.1055.

As Marrero helped Greene out of the cab, Greene pulled "a wad of money out of his pocket." The cab driver said that the fare it was "already paid for, don't pay, and [Greene] put his money back." T.1130, 1056-57. Marrero and the cab driver then helped Greene walk to the rear of his house. T.1131. Greene said, "[L]eave me alone, I'm fine," and he shook Marrero's hand. T.1133. Marrero left at that point. T.1133.

A short time later, when Marrero "heard dogs barking" outside, he went to the back yard where he saw "[o]ne black man [who] was towards the alley and the one [black male] with braids [who] was leaning over [the victim]." T.1135-36. The individuals were the same black males he had just seen on Stone's porch. T.1138-39. Marrero identified Montana in court as the black male who was "leaning over" the victim. T.1140. When they saw Marrero, "they took off running." T.1140. Marrero went inside and told his mother; she ran outside and looked at Greene, who was "laying on his back" with "[h]is feet like twisted near the steps." They saw "[b]lood coming out of his ear and the back of his head and . . . like his stuff out of his pockets. T.1141. Marrero's mother, Joanne Scott, ran inside to call the police.

-3-

Officer Robert Rosati ("Officer Rosati") was one of the first to respond and was responsible for collecting evidence and photographing the crime scene. T.893-96.  On the sidewalk immediately in front of the rear entrance to a second floor apartment, he saw several round or circular spatters of what "looked like wet blood," and there were several personal items strewn around the victim. T.897-99. He also noticed some "reddish stains" on the doorway frame, the face of the door, and the doorknob. T.901. Officer Rosati examined the stairwell for signs of an altercation or disturbance but found no blood, hairs, fibers, or human tissue, or signs of damage to the walls or stairs. T.907.

Walter Fraser ("Fraser") and Reuben Byrd ("Byrd"), testified that they shared a duplex next door to Stone's house and the victim's apartment. On the night of March 5, 2000, they were at home watching T.V. in the living room. T.819, 854. At about 8:30 p.m., a black male came to the door, entered the house, and asked them for a crowbar. T.820. Fraser had seen the man earlier that day in front of his house. T.821. Fraser described this individual as a "[b]lack male, skinny" who "had braids down to his shoulders, had a coat on[.]" Fraser estimated that the man was about twenty- or twenty-two years-old.  T.821-22.  Byrd described him as a black male, "[t]hin build," about 5' 8"-tall, with braids in his hair. T.855. Byrd also had seen the man a "couple days before" at Stone's house and "earlier that day." T.855. Byrd said that he knew this individual as Donald Montana, and he identified him at trial. T.856.

In response to Montana's request for the crowbar, Byrd responded, "We don't have a car so there's no need for us to have a crowbar." T.823, 856. Fraser recalled that while this person was in the house, somebody walked by outside the window. T.823. At that point, Montana turned around and walked out. T.856. About ten minutes later, Fraser hear sirens and saw the ambulance

and fire trucks arrive. T.824. Neither Byrd nor Fraser saw Montana after that. T.857.

Amber Stone ("Stone") lived in the other half of the duplex at 1508 Ashland Avenue next door to Fraser and Byrd. T.1263. She testified that she had known Montana or "Montie" since 1996 as friends. T.1268-72. According to Stone, Montana had had a key to her house since May 1999. T.1277. On March 3, March 4, and March 5, 2000, Montana came over to her house to visit. T.1275. On the afternoon of March 5th, Montana arrived by himself at her house at about noon. T.1278-79. He ate, took a shower, changed into tan boots, black jeans, a grey checkered shirt, a black shearling coat, and a blue bandanna. T.1279, 1281. Rogers, whom she knew as "Montie's" friend, had stopped by as well but had arrived about fifteen minutes before Montana. T.1280. Stone testified that Rogers had visited her house with Montana previously. T.1280. They stayed until about 1:30 p.m. Rogers wearing a black shearling coat, and a "do rag" bandanna with a Yankees ear warmer over it. T.1281-82.

Stone left her house for several hours; when she returned home at about 10 p.m., she noticed that there were police and neighbors all around her house. T.1285. Detective James Lincoln ("Detective Lincoln") spoke with her and she agreed to go to the police station for an interview. She gave a sworn statement to Detective Lincoln at about 11:00 p.m. T.1434. Stone testified she mentioned to the police that she had phone numbers of places the men might be; while at Stone's house, "Montie" had used her telephone and had left pieces of paper with telephone numbers on them in her apartment.  T.1290, 1434.

After obtaining a statement from Stone, Detective Lincoln drove her back to her apartment and she showed him the slips of paper.  At Detective Lincoln's request, at about 12:15 a.m., Stone started calling the various phone numbers. T.1292-93; 1435 Eventually, she reached

Montana at the number on the slip of paper which had the name "LaShawn" on it with a drawing of a "smiley face."  T.1435-36. Stone testified that she recognized his voice because she had talked to him on the phone before.  T.1294-95.

Detective Lincoln then contacted the police department's telephone security division and determined that LaShawn's telephone number belonged to a residence at 423 Sixth Street in the City of Niagara Falls.  T.1438-40. There also was a message on Stone's telephone answering machine from "Montie" asking her to "[g]ive him a call when [she] got in, make sure [she] was all right." T.1295. She denied that he said anything else on the message. T.1295.

Stone testified that since the incident, she maintained a friendship with Montana. When asked if she had ever talked to Montana about the case, she said, "[N]ot that I can remember." She testified that she talked to him about once a week but denied ever talking with him about the criminal case. T.1306-07. Stone admitted that she asked him about the case. T.1307 (Q: You never asked him, you know, hey, Montie? A: Well, yeah, I asked him, but no. Q: What if anything did he say? A. No.").  When asked if Montana "ever indicate[d] . . . that he was in the back yard with Joe Greene on March 5th," Stone responded, "[s]omething was mentioned that Chuck [Rogers] checked the pockets, but that was about it." T.1307. Stone confirmed that Montana had acknowledged that "he was behind 1510 Ashland and witnessed Charles [Rogers] check Joe Greene's pockets[.]" T.1308. Stone testified that Montana told her that Rogers removed "like 26 dollars" and he "knew how much money . . . was taken[.]" T.1308-09.

LaShawn Walker ("Walker") testified that she met Montana in the early part of 2000 and typically saw him every day. T.1339. On March 3, 2000, he spent the night at her apartment. He stopped by to see her on March 4, 2000, as well, but did not spend the night there. T.1340. On

March 5, 2000, Montana and a man whom she knew as "Chuck" (*i.e.*, co-defendant Rogers) came by her apartment for "[a] few minutes" "just after noon[.]" T.1341-42. Walker related that she spoke to Montana on the phone that night at "[m]aybe 9:30" although she stated that "[i]t could have been" "a little later[.]" T.1342. Montana asked Walker about her plans for that evening. Later, Montana and Chuck came over and she cooked for them.T.1343. They were wearing "[b]lack jackets, black coats, with some jeans." T.1344. According to Walker, Montana and Chuck "were just laughing, acting a little silly." T.1345. She asked them what was so funny; Montana did not say anything and "just started laughing again." T.1345.

Montana left at some point to go get some beer; when he returned they all played cards. T.1346. Montana indicated that he "wanted to leave" but he did not leave right away. T.1347. Walker retired for the evening, and Montana got into bed with her. T.1347. Later, the phone rang; she could tell that it was for Montana since the caller identification displayed the phone number he had given her as the place he was staying and which she had called before. T.1348. Walker had reason to believe that number was Stone's residence. Upon answering the phone, Walker recognized Stone's voice; she handed the phone to Montana. T.1350. About fifteen minutes later, Rogers called. T.1352

Eventually, at about 2:30 a.m., Walker was awakened by "some bamming" on her front door. T.1352, 1393. When the police identified themselves, Montana "jumped up . . . and he just said, oh shit, it's the police." T.1353. Walker testified that she opened the door to the police standing on the front porch and said, "[W]hat did they do[?]" Detective Lincoln confirmed who Walker was and asked her whether Montie was there; "[s]he said yes" and "turned and . . . pointed upstairs." T.1355, 1445. Walker confirmed that there "was no hesitance on [her] part to

stop them[.]" T.1395-96.

Walker testified that she next saw Montana a few months later and in the time between the incident and trial in October 2000, saw him about ten times and spoke to him on the phone about five times. T.1363, 1396-97. Montana said "he didn't do it, he just ran his pockets[,]" meaning that he "[w]ent through [the victim's] pockets." T.1364, 1397. Montana "didn't say" whether he got anything and he "didn't say if anybody was with him." T.1364. There was "no mention about money" during that conversation, according to Walker. T.1365.

Montana was transported to the police station where he waived his rights under *Miranda*.[2] T.1458. He first gave an oral statement admitting being at the crime scene and seeing the victim, but denying any involvement in the robbery or murder. See T.1459-75. After being read the *Miranda* warnings a second time, and agreeing to waive his rights, Montana gave another statement which was reduced to writing and which he signed. T.1475-78. Petitioner's statement was read into the record at trial and stated, in pertinent part, as follows:

> On Sunday [March 5, 2000], sometime around 1:30 pm., I went over to Amber[ ] [Stone]'s house at 1508 Ashland. . . . Charles Rogers was there. . . . Amber went to work about 4 p.m. . . . We . . . left and . . . then went back to Amber's house, and it was sometime between 7 and 8 p.m. . . . I had called my friend, LaShawn [Walker], and told her that . . . we were coming over. When we walked out of the house, a cab pulled up. Cab driver was trying to get the passenger of the back seat but he kept falling asleep. The cab driver . . . then got the black male across the street to help. The black male then went to a neighbor next door and a kid came out to help. They final got him out of the cab and man tried to pay the cab driver again. The kid [*i.e.*, James Marrerro] told someone that he had a wad of money. They then walked him to the side of the house and he was staggering. . . [W]e then got on the bicycle and took off. We both then talked about going back and taking the guy's money. We then circled right back to the house, went in between the houses and went into the back yard where the guy lived. I looked and saw the guy laying on the ground at the door at the foot of the stairs. I then said let's go.

---

[2]  *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).

> Charles and I went over to the guy laying there and Charles went into his pockets and took the money out. I did not take anything from his pockets. I observed that he was bleeding from his ear. We then heard somebody coming out the door and I observed the kid from the front of the house coming out. I was in the alley and the kid saw Charles and we took off running. We ran a few houses up and we stopped and Charles gave me 25 or 26 dollars. We then took off and went to LaShawn's house, and that's where the police located us. We never touched or injured the guy in the yard. We both got 26 dollars.

T.1475-78.

Dr. Loghmanee, the Associate Chief Medical Examiner at the Erie County Medical Center, testified that he found bruises on the victim's eyelid and a stellate laceration on the occipital (back of the head) where the scalp was separated from the skull bone. The separation was full of blood and separation was the result of depression of the bone. T.780-81. A skull fracture extended from ear to ear and there was blood coming out of the left ear. T.785, 787. The skull bone was fractured and the lines of fracture were extending to the front and upward, and there were bruises on the brain. T.783. On the right side, there was a large accumulation of blood under the dura, the membrane which covers the brain and separates brain from skull bone of the brain. T.784. The medical examiner opined that the abrasion to the brain "[d]efinitely" signified "trauma and force which ha[d] reached to the brain and caused the brain [to] move and caused death." T.785. On the left side of the skull, there was a fracture of the temporal bone. The right temporal lobe of the skull was fractured in the area corresponding to where blood had accumulated under the dura and where the brain was abraded. There were stellate fractures on both the right and left sides, indicative of "blunt force reaching to that area causing fracture." T.786. The medical examiner opined that the type of force necessary to cause the type of injuries sustained by the victim was "definitely [a] very strong, powerful force." T.789.

-9-

The medical examiner decided to visit the crime scene because he wanted to rule out the possibility that the victim might have fallen down the stairs and sustained injury in that manner. T.794. After his investigation, however, he concluded that the various areas of trauma to the head and the "multiple areas" and "amount of damage" which caused the skull bone to fracture, damaging the brain, were "inconsistent with just [a] simple fall." T.794.  To a reasonable degree of medical certainty, the type of object that would have caused injuries consistent with those sustained by the victim was something capable of inflicting "[s]trong, blunt force injuries from different directions to the head." T.794. In his opinion, "[a]ny blunt, hard object" could have caused such injuries. T.794. The medical examiner testified that because the injury to the back of the victim's head was semi-circular and it was abraded on one side and pocketed on the other, it could have been done with an object such as a baseball bat. T.795.

The defense presented Dr. George Abbott ("Dr. Abbott") as their medical expert, who concluded, "I don't think there was a blow to the back of the skull. I think that the decedent fell heavily striking the back of his head." T.1600; *see also* T.1608. The defense expert based his conclusion primarily on the medical examiner's finding of a laceration, or tear of the scalp, across the base of the skull extending from ear to ear. T.1600. Dr. Abbott opined that this injury would have been caused by a fall onto a hard flat surface. T.1603, 1621.  He testified that "[t]here were no impact injuries of the scalp in relation to the other [skull] fractures;" that was his sole basis for ruling out that the victim had suffered blunt-force trauma to the head. T.1601, 1604.  On cross-examination, Dr. Abbott admitted that a blow from a brick or another hard object could have caused the laceration to the scalp extending from ear to ear, but he insisted that a hard object could not have caused any of the other skull fractures sustained by the victim. T.1624-25.

Dr. Abbott did not present any possible explanation or cause for the other injuries suffered by the victim, *e.g.*, the stellate fractures to the right and left sides of the skull, which the medical examiner had indicated were caused by blunt-force trauma.  He conceded that he spent "[a]bout two hours" reviewing the autopsy report, the medical records, and the police report and although he reviewed the photographs of the victim's injuries, he "relied most heavily" on the autopsy report's description of what the medical examiner observed. T.1619. Dr. Abbott said that the victim must have sustained a "heavy fall" and he "would assume from . . . possibly a position on the stairs" where he was found. T.1620. Dr. Abbott stated that he did not visit the crime scene, however.

The jury returned a verdict convicting Montana as charged in the indictment. He was sentenced on December 15, 2000, to twenty-five years to life in prison on the second degree murder conviction with a concurrent determinate term of twenty-five years on the first degree robbery conviction, followed by a mandatory five-year period of post-release supervision regarding the robbery conviction.

Montana, represented by new assigned appellate counsel, appealed his conviction to Appellate Division, Fourth Department, of New York State Supreme Court. Montana also filed a *pro se* supplemental brief.  On October 3, 2002, the Appellate Division unanimously affirmed Montana's conviction. *People v. Montana*, 298 A.D.2d 934 (App. Div. 4th Dept. 2002). Leave to appeal to the New York Court of Appeals was denied December 18, 2002. *People v. Montana*, 99 N.Y.2d 561 (N.Y. 2002).

This federal habeas petition followed in which Montana raises the following grounds for relief: (1) petitioner's statement to police and physical evidence were in violation of his Fourth

Amendment rights; (2) the prosecution failed to prove beyond a reasonable doubt that petitioner

forcibly stole money from the victim and therefore the evidence was insufficient to support the

robbery conviction; (3) the evidence was insufficient to prove beyond a reasonable doubt that

petitioner caused the victim's death by striking him in the head; (4) the trial court erred in

denying petitioner's *Batson*[3] challenge; (5) the jury pool was racially biased; (6) prosecutorial

misconduct during summation denied petitioner his right to fair trial; (7) trial counsel was

ineffective in failing to renew his trial order of dismissal after the defense rested and in failing to

"properly address whether there was a Fourth Amendment violation with regard to Petitioner's

arrest"; and (8) petitioner's sentence was unduly harsh and excessive. *See* Petition ("Pet.") at 3-6,

¶¶A-H (Dkt. #1); Petitioner's Reply Memorandum of Law ("Pet'r Reply Mem.") at 20-21 (Dkt.

#13).

Respondent answered the petition and interposed the affirmative defense of procedural

default as to several of Montana's claims, as discussed more fully below. *See* Respondent's

Memorandum of Law ("Resp't Mem.") at 14-15, 17-18 (Dkt. #4). Respondent admits that

Montana has exhausted all of the claims raised in the petition (Dkt. #1). *See* Respondent's

Answer ("Ans.") at 2, ¶10 (Dkt. # 3); *see also* 28 U.S.C. § 2254(b)(1).[4]

## III.    Discussion

---

[3]        *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

[4]        The Court notes that in his Reply Memorandum of Law (Dkt. #13) submitted in response to respondent's Answer, Montana appears to assert a claim that appellate counsel was ineffective in failing to argue that trial counsel was ineffective. Although this claim is arguably unexhausted, the Court recommends that it be dismissed on the merits pursuant to the authority granted pursuant to Section § 2254(b)(2) of the habeas statute. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). As discussed more fully below in this Report and Recommendation, any contention by Montana that he was deprived his Sixth Amendment right to the effective assistance of appellate counsel is without merit under any standard of review.

A.      **Standard of Review**

The filing of Montana's petition post-dates the April 24, 1996 enactment of the Anti-

terrorism and Effective Death Penalty Act ("AEDPA") and therefore is governed by that statute's

amendments to 28 U.S.C. § 2254.  When a state court has adjudicated a habeas petitioner's

claims on the merits, habeas relief may not be granted unless the state court's holding was

contrary to, or was an unreasonable application of, clearly established Federal law, as determined

by the United States Supreme Court; or was based on unreasonable determination of the facts in

light of the evidence presented in petitioner's state court proceeding. *See* 28 U.S.C. § 2254(d)(1),

(2); *Williams*, 529 U.S. at 412-13.

B.      **Procedural Default**

Respondent contends that Montana's claims regarding the sufficiency of the evidence

supporting the "cause of death" element in regard to the murder conviction (Ground Two), the

sufficiency of the evidence supporting the robbery conviction (Ground Three), and the racial

composition of the jury pool (Ground Five) are procedurally defaulted under the "adequate and

independent state ground" doctrine because petitioner failed to properly preserve those claims for

appeal.

1.      **"Adequate and independent state ground" doctrine**

The Supreme Court has held that federal courts shall "not review a question of federal

law decided by a state court if the decision of that court rests on a state law ground that is

independent of the federal question and adequate to support the judgment." *Coleman v.

Thompson*, 501 U.S. 722, 729 (1991) citations omitted). "This rule applies whether the state law

ground is substantive or procedural." *Id.* (citations omitted). The independent and adequate state

ground doctrine may bar federal habeas review "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement" for in such cases "the state judgment rests on independent and adequate state procedural grounds." *Id.* (citing, *inter alia*, *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977)). Thus, an adequate and independent finding of procedural default precludes federal habeas review of the federal claim, unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Murray v. Carrier*, 477 U.S. 478, 485 (1986), or demonstrate that the failure to consider the federal claim on habeas will result in a "fundamental miscarriage of justice,'" *id.* at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)).

Federal review is precluded under this doctrine only when the state ground is both an "independent" basis for, and "adequate" to support the decision. *See Harris v. Reed*, 489 U.S. at 261-62; *accord, e.g.*, *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006). "The state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," *Harris*, 489 U.S. at 261-62. For a state ground to be considered "independent," it must be "clear from the face of the opinion" that the court intended to rely on the state rule in disposing of the federal claim. *Coleman*, 501 U.S. at 735 (quotation marks omitted); *accord, e.g.*, *Messiah*, 435 F.3d at 195. "[A] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Whether application of the procedural rule is "'firmly established and regularly followed'" must be judged in the context of "the specific circumstances presented in the case," and "of the asserted state interest in applying the procedural rule in such circumstances." *Cotto v. Herbert*, 331 F.3d 217,

240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362, 386-87 (2002)). The Second Circuit has

directed reviewing courts to determine the adequacy of the procedural bar by examine the

circumstances of the case, directed by the following the three factors, or "guideposts," used by

the Supreme Court in *Lee v. Kemna*, 532 U.S. at 381-85: (1) whether the alleged procedural

violation was actually relied on in the state court, and whether perfect compliance with the state

rule would have changed the state court's decision; (2) whether state caselaw indicated that

compliance with the rule was demanded in the specific circumstances presented; and (3) whether

petitioner has "substantially complied" with the rule given "the realities of trial," and, therefore,

whether demanding perfect compliance with the rule would serve a legitimate governmental

interest. *Cotto*, 331 F.3d at 240 (quoting *Lee*, 534 U.S. at 381-85).

### a.    The jury pool claim is procedurally defaulted.

The Appellate Division held that Montana waived his argument regarding the racial

composition of the jury pool by failing to assert the challenge the panel of prospective jurors

before jury selection started pursuant to New York Criminal Procedure Law § 270.10(2).[5]

Because of this procedural default, the Appellate Division did not address the merits of the jury

pool claim at all. The state appellate court plainly stated that its judgment was procedural and

there is no indication from the face of the decision that the holding was based on anything other

than the state procedural preservation rule set forth in C.P.L. § 270.10(2). Thus, there was an

"independent" state basis for dismissal of the jury pool claim. *See Cotto*, 217 F.3d at 239

---

[5]    "A challenge to the panel must be made before the selection of the jury commences, and, if it is
not, such challenge is deemed to have been waived. Such challenge must be made in writing setting forth the facts
constituting the ground of challenge. . . ." N.Y. Crim. Proc. Law § 270.10(2).

(holding that where the state court of appeals declined to address the merits of petitioner's claim that complete preclusion of cross-examination was improper, based on its implicit conclusion that petitioner did not comply with the contemporaneous objection rule codified in N.Y. Criminal Procedure Law § 470.05(2) at trial, there was "no question" that the claimed procedural bar constituted an "independent" state ground of decision).

With respect to the "adequacy" requirement, C.P.L. § 270.10(2)'s preservation requirement appears to be a "firmly established" and "regularly followed" rule: The Second Circuit has remarked upon New York's "unwavering New York practice of declining to consider jury selection claims unless presented at the time the jurors are chosen." *Epps v. Commissioner of Corr. Services*, 13 F.3d 615, 619 (2d Cir. 1994) (citing, *inter alia*, *People v. Ortiz*, 69 A.D.2d 825, 825 (App. Div. 2d Dept. 1979) (holding objection to jury selection process waived where not raised until after entire panel had been sworn); *People v. Harris*, 151 A.D.2d 961, 961 (App. Div. 4th Dept.1989) (holding *Batson* claim untimely because it was not made "before the jury, or the last juror including the alternates, is sworn," but remanding for new trial in interests of justice)); *see also People v. Parks*, 41 N.Y.2d 36, 41 (N.Y. 1976) ("CPL 270.10 provides that [in order to properly challenge to the jury panel in the trial court and thereby preserved the issue for appellate review] the challenge to a jury panel must be made 'in writing' before selection of the jury proceeds."); *accord*, *e.g.*, *People v. Hardy*, 38 A.D.3d 1169, 832 N.Y.S.2d 722, 723 (App. Div. 4th Dept. 2007); *People v. Sloan*, 202 A.D.2d 525, 525 (App. Div. 2d Dept. 1994). Indeed, the New York Court of Appeals has stringently held appellants to following C.P.L. § 270.10(2) to the letter. *E.g.*, *People v. Consolazio*, 40 N.Y.2d 446, 455 (N.Y. 1976) ("In this instance while a motion to challenge the jury panel was made orally before jury selection began (and then

rejected) the written notice was not given until after selection of the jury had been completed although before any witness had been sworn. In this circumstance, irrespective of the willingness of the trial court to consider the motion on the merits, the error if any in the denial of the motion was not preserved for our review.").

In opposition to respondent's argument concerning the procedural default of this claim, Montana does not assert the existence of cause or prejudice, *Murray v. Carrier*, 477 U.S. at 485, or that he is "actually innocent" and therefore qualifies for the "fundamental miscarriage of justice" exception, *id.* at 496. He "takes a different position" on the issue, asserting that this Court "may review any claim when it 'resulted in an unreasonable determination of the facts in light of the evidence presented.'" Pet'r Reply Mem. at 17 (Dkt. #13). The quoted standard, however, comes from AEDPA's revisions to the habeas statute and only applies when the reviewing court has reached the merits of a petitioner's claim. 28 U.S.C. § 2254(d)(2).[6] Section 2254(d)(2) has no relevance in determining whether the court may excuse the procedural default of a claim in order to review it on the merits.

After reviewing the record, the Court can find neither cause to excuse the procedural default of the jury pool claim, nor prejudice attributable thereto. Moreover, Montana has not demonstrated that he is "actually innocent" so he has failed to show that a fundamental miscarriage of justice would occur should the Court decline to review petitioner's claim

---

[6]     Section 2254(d) provides in part that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

regarding the jury panel, the Court finds that it is procedurally defaulted and accordingly recommends that it be precluded from further habeas review on that basis.

**b.       The "insufficiency of the evidence" claims are without merit.**

Montana claims that evidence was insufficient to support the first degree robbery conviction because the prosecution failed to establish beyond a reasonable doubt the elements of first degree robbery. *See*, *e.g.*, Pet. at 4, ¶B (Dkt. #1). He also contends that felony murder conviction is based on insufficient evidence because the prosecution failed to prove that he actually "caused the death" of the victim. *See id.* The Appellate Division considered both claims together and held that "[d]efendant failed to renew his motion after presenting witnesses for the defense 'and thus waived "subsequent review of that determination[.]"'" *People v. Montana*, 298 A.D.2d at 935 (quoting *People v Grantier*, 295 A.D.2d 988, 988 (App. Div. 4th Dept. 2002) ("Defendant presented evidence after the court denied the motion and thus waived 'subsequent review of that determination[.]'") (quoting *People v Hines*, 97 NY2d 56, 61 (N.Y. 2001) ("[A]n insufficiency argument may not be addressed unless it has been properly preserved for review during the trial. And we have held that 'a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, proceeds with the risk that he will inadvertently supply a deficiency in the People's case[.]' Thus, a defendant who presents evidence after a court has declined to grant a trial motion to dismiss made at the close of the People's case waives subsequent review of that determination.") (citing *People v Carter*, 63 N.Y.2d 530 (N.Y. 1984); *People v Kirkpatrick*, 32 N.Y.2d 17, 21 (N.Y. 1973) (in turn citing *People v Corbisiero*, 290 N.Y. 191 (N.Y. 1943); *People v Farina*, 290 N.Y. 272 (N.Y. 1943); *People v Trotta*, 30 A.D.2d 562 (App. Div. 2d Dept. 1968)), *rearg. denied*, 97 N.Y.2d 678 (N.Y.

-18-

2001)).

It appears that in Montana's case the Appellate Division may have inadvertently misquoted the holdings of *People v. Grantier*, 295 A.D.2d at 988, and *People v. Hines*, 97 N.Y.2d at 61. Those cases, and the other cases cited above, hold that once a defendant presents evidence on a charge at his trial, he subsequently waives any argument going to the sufficiency of the evidence for purposes of appellate review. In other words, a defendant's introduction of proof in his behalf at trial renders futile a motion for dismissal based on insufficiency of the evidence. *See People v. Kirkpatrick*, 32 N.Y.2d at 21 ("However, it is settled that a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, proceeds with the risk that he will inadvertently supply a deficiency in the People's case.") (citing, *inter alia*, *United States v. Calderon*, 348 U.S. 160, 164 n.1 (1984) ("By introducing evidence, the defendant waives his objections to the denial of his motion to acquit."); *accord People v. Hines*, 97 N.Y.2d at 61. This is what occurred in this case–Montana presented a defense expert witness to testify as to the cause of death and whether the victim had been assaulted. Since Montana presented a defense, it appears that under *People v. Hines*, *e.g.*, he could not have preserved the claims for review had he renewed the motion for a trial order of dismissal. The Court accordingly is inclined to agree with respondent that the Appellate Division relied on a state procedural rule to deny Montana's claims regarding the sufficiency of the evidence. However, because it would be more time consuming to decide the "adequate and independent" issue, given the circumstances, the Court recommends disposing of these claims on the merits as, discussed below, they clearly do not provide a basis for habeas relief.

The law in concerning the sufficiency of the evidence is well settled: The reviewing

court's inquiry is limited to asking whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord*, *e.g*, *People v. Contes*, 60 N.Y.2d 620, 621 (N.Y. 1983).  Under the *Jackson* standard for reviewing evidentiary sufficiency, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *accord Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal."); *United States v. Vasquez*, 267 F.3d 79 (2d Cir. 2001) ("The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility.") (citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility.") (citing *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir. 1985)); *Glasser v. United States*, 315 U.S. 60, 80 (1942) ("It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."), *superseded by statute*, *in part*, *as recognized in Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) ("The jury chose to believe the State's witnesses, despite the inconsistencies in the evidence . . . . We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence.").

Turning first to the robbery conviction, Penal Law § 160.15(1) provides that "[a] person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of

the commission of the crime or of immediate flight therefrom, he or another participant in the

crime . . . [c]auses serious physical injury to another person who is not a participant in the crime.

. . ." N.Y. Penal Law § 160.15(1). Montana was charged as an accomplice under Section 20.00[7]

of the Penal Law.  *See*, *e.g.*, T.1798 *et seq*. Viewing the following evidence in the light most

favorable to the prosecution, a rational jury easily could have found petitioner guilty beyond a

reasonable doubt as either the principal actor in, or the accomplice to, of the forcible robbery of

Greene.

Montana admitted to his friend Amber Stone that he watched his cohort, Rogers, "check

Joe Greene's pockets" and that he knew how much money Rogers removed. T.1308-09. Montana

also told his friend LaShawn Walker that he personally "ran [the victim's] pockets[,]" meaning

that he "[w]ent through his pockets." T.1364. Montana admitted to the police that when he and

Rogers saw the victim "staggering" out of the cab, they "talked about going back and taking [the

victim's] money," and so he admitted to planning the robbery beforehand. When he and Rogers

saw the victim next, Montana told the police that he said "[L]et's go," thereby setting the robbery

in motion. Montana told the police that they "went over to the guy laying there"[8] and Rogers

"went into his pockets." Montana denied taking anything out of the victim's pockets but he

admitted to sharing in the fruits of the crime; he told the police that Rogers gave him half of the

$52-take.

---

[7]        "When one person engages in conduct which constitutes an offense, another person is criminally
liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits,
requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal Law §
20.00.

[8]        According to Montana, the victim already had been injured and was prone on the ground when
they found him.

Marrero, who helped the inebriated victim out of the cab, testified that a short time after he left the victim at his backsteps, he heard dogs barking and came outside to see the same black males who had been on Stone's porch standing and "leaning over" the victim. When these two black males saw Marrero, they ran away. Marrero then discovered the victim lying on the ground, unconscious, bleeding from a head wound. Marrero said that "stuff [was] out of [his] pockets." Marrero identified Montana at trial. Byrd, another neighbor, also saw the black males standing on the porch and identified Montana as one of them. The jury thus had before it compelling direct and circumstantial evidence of Montana's culpability as both an accomplice and as a principal. *See People v. Lawrence*, 186 A.D.2d 1016, 1016-17 (App. Div. 4th Dept. 1992) (evidence sufficient to support conviction where eyewitness testimony placed defendant on scene walking toward victim's vehicle immediately before shooting, and another eyewitness testified that she observed defendant standing next to victim's vehicle holding a smoking gun in his hand).

After reviewing all of the evidence presented at Montana's trial in the light most favorable to the prosecution, it is clear to the Court that there was more than sufficient evidence to prove that Montana was guilty beyond a reasonable doubt, either as an accomplice or as the principal, of forcibly stealing money from the victim and inflicting serious physical injury on him while committing the robbery. Indeed, the evidence against petitioner was compelling. Accordingly, based on the testimony presented at trial, it was entirely rational for the jury to return the verdict convicting Montana as it did. The Court recommends that habeas relief not be granted on this claim.

Turning next to Montana's claim that the prosecution failed to prove beyond a reasonable doubt that petitioner assaulted the victim and thereby caused his death, a person is guilty of

second degree (felony) murder when, "[a]cting either alone or with one or more persons, he commits or attempts to commit robbery . . . , . . . and in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants[.]" N.Y. Penal Law § 125.25(3).

The prosecution's medical expert found multiple fractures to the victim's skull and scalp along with areas of abrasion and trauma to the brain itself, consistent with "very strong, powerful" "blunt force" striking those areas. *See* T.780. After examining the crime scene, the prosecution's expert ruled out the possibility that the victim died as a result of falling down the stairs due to the multiple areas of trauma to the head and the extent of the damage to the skull, finding that they were inconsistent with a simple fall.  To a reasonable degree of medical certainty, according to the prosecution's expert, the victim's cause of death was caused by blunt force injuries from different directions to the skull, which could have been administered by any blunt, hard object, such as a baseball bat.

The defense's medical expert, on the other hand, concluded that victim died as the result of striking his head during a fall based solely on the autopsy finding of a laceration of the scalp, extending from ear to ear. According to the defense expert, this wound was "most likely" caused by a fall onto a hard flat surface. He admitted, however, that a blunt, hard object could have caused that wound but he insisted that such an object could not have caused any of the other injuries suffered by the victim, *e.g.*, the stellate fractures to the right and left sides of the skull, which the medical examiner had indicated were caused by blunt-force trauma. The defense expert failed to present any possible explanation or cause for the other extensive injuries sustained by the victim apart from simply disagreeing with the medical examiner's findings. He

-23-

only performed a two-hour review of the medical examiner's pathology report and photographs

of the body and did not actually perform his own autopsy. Although his expert opinion was that

the victim's cause of death was the result of striking his head in a simple fall, he did not visit the

crime scene or perform any estimates about how far the victim theoretically could have fallen

based on the layout of the stairs in question.

"A jury can accept or reject the opinion of an expert[.]" *People v. Higgins*, 5 N.Y.2d 607,

631 (N.Y. 1959) (citations omitted). The nature and extent of the victim's skull injuries, viewed

in conjunction with petitioner's admissions and the other direct and circumstantial evidence that

the victim was assaulted and robbed, supported the prosecution's theory that the victim's death

was caused by blunt-force trauma to the head inflicted by petitioner and his co-defendant. The

defense theory that the cause of death was a simple fall was not supported by the physical

evidence, and the defense expert based his death on only one of the victim's skull injuries and

did not offer any alternative explanation for how suffered the remaining the traumas to the head.

Viewing the trial evidence as a whole in the light most favorable to the prosecution, as it must,

the Court finds that it was entirely rational for the jury to conclude that the defense expert's

opinion testimony was unworthy of belief in comparison to that offered by the prosecution's

expert. The jurors had the expert witnesses before them, and it was for them to observe their

demeanor, assess their credibility, and determine reliance that should be placed on their opinions,

given each expert's opportunity to analyze the evidence at hand; it is not the province of this

Court to usurp that function. *See*, *e.g.*, *Higgins*, 5 N.Y.2d at 631. Accordingly, the Court

recommends dismissal of Montana's claims premised on the insufficiency of the evidence to

support his convictions for robbery and felony murder.

## C.    Analysis of the Petition's Remaining Claims

### 1.    Petitioner's *Batson* claim is without merit.

Montana contends that the prosecutor exercised a peremptory strike against a black juror, Mrs. Mallory, in a racially discriminatory manner, in violation of *Batson v. Kentucky* and the Equal Protection Clause.

"[T]he Equal Protection Clause [of the Constitution] forbids the prosecutor to challenge potential jurors solely on the account of their race." *Batson v. Kentucky*, 476 U.S. at 89. To assist trial courts in evaluating whether a party exercised a peremptory challenge in a discriminatory manner, the Supreme Court in *Batson* fashioned a three-part burden-shifting test. *Id.* at 96-98. First, the opponent of a peremptory challenge must make a *prima facie* case of racial discrimination. If the trial court finds a prima facie case has been established, the burden shifts to the proponent of the peremptory strike to come forward with a race neutral explanation. *Purkett v. Elem*, 514 U.S. 765, 767 (1995). The non-moving party's burden at step two is "very low." *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir.2003) (citing *Purkett*, 514 U.S. at 768); *accord Green v. Travis*, 414 F.3d 288, 295 n. 2 (2d Cir. 2005). In fact, the race neutral reason need not be "'persuasive or even plausible[.]'" *Rice v. Collins*, __ U.S. __, 126 S. Ct. 969, 974 (2006) (quoting *Purkett*, 514 U.S. at 767-8). The Supreme Court consistently has held that "so long as the reason is not inherently discriminatory, it suffices." *Id.*  At step three, the trial court then must look at the proffered race neutral explanation and decide whether opponent of the strike has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *see also Purkett*, 514 U.S. at 768. It is not until this step that the persuasiveness of the justification becomes relevant. *Purkett*, 514 U.S. at 768 (citing *Batson*, 476 U.S. at 98; *Hernandez v. New York*, 500

U.S. 352, 359 (1991) (plurality opinion).

During the *voir dire* at Montana's trial, there was one black juror on the panel, Mrs.

Mallory. The prosecutor attempted to exercise a for-cause challenge against her based upon his

belief that she was withholding information that one or more of her relatives or family members

in fact had been criminally prosecuted or had criminal convictions.[9] The trial court noted that the

---

[9]         The relevant portion of the colloquy regarding the prosecution's "for cause" challenge is set forth

below:

| | |
|---|---|
| Mr. Winter: | I'll tell you the reason I'm challenging [juror Mrs. Mallory] for cause. I'm going to suggest to the Court that Mrs. Mallory has not been forthcoming in her responses, and indeed, I felt that Mr. Privateer [defense counsel] felt the same way this morning in the chambers when we were talking and he alluded to the same thing, that he felt she was holding something back. Specifically, Judge, I asked the question about whether the person that was shot was Carl Mallory, for two reasons. Number one, I had reason to believe that indeed that was the person she was talking about because of my history in the D.A.'s office, knowing that Carl Mallory was indeed the victim of a shooting at a club in Niagara Falls. But moreover I wanted to see what her relationship was with that individual and others. And I know from my history that Carl Mallory and some others, James Mallory comes to mind, some other Mallorys, have all been prosecuted by the D.A.'s office during my tenure. She's asked by a questionnaire, anyone, you, relative or close friend been accused of a crime, convicted of a crime. She never addressed those issues, and for that reason I think she was being evasive. I think she was telling us what she could say or do to further her chance to get on this jury, and I think because that, Judge, she's not trustworthy. I have every reason to believe that there are members of her family who have been prosecuted by our office and she did not say that. She was not forthcoming with that information and I think that creates a serious problem about her integrity and credibility, if you will, to sit on this particular case as a juror in this case. I have some grave concerns about that, and frankly, Judge, that is completely race neutral, if the Court is concerned about that issue. She just – because I know the family and I've prosecuted them, and I know there's a connection there, she refused and did not answer those questions and she should have. |
| Thte Court: | Mr. Privateer? |
| Mr. Privateer: | Well, it's funny that Mr. Winter doesn't believe this witness [sic], therefore this witness ought to be excluded, however I didn't believe the other witnesses, therefore he doesn't think that that's necessarily good enough. |
| The Court: | Well, you were rendering an opinion. He's stating a fact. |
| Mr. Privateer: | He's stating a fact that she didn't say anything about some particular – I'm not even sure which particular people we're talking about. |
| The Court: | She has three brothers that I'm aware of, all of whom have been prosecuted many, many, many times. |
| Mr. Privateer: | Okay. Did Mr. Winter ask her when she had the opportunity? |
| The Court: | And to not answer that question certainly is suggestive of the fact that she's not forthcoming but – |

prosecutor had not asked her the question directly and denied the for-cause challenge, stating that

the prosecutor could challenge her peremptorily. Subsequently, the prosecutor did exercise a

peremptory challenge against Mrs. Mallory; defense counsel objected and the trial court

requested a race neutral reason from the prosecutor.

    The prosecutor explained that he at first "had some serious thoughts of keeping her [on

the jury] because of a response she gave about her brother being killed and she's upset, if you

take it a certain way, that no one is brought to justice[.]" T.470. However, after discussing it with

---

| Mr. Privateer: | Well, people tend to skip through those things and sometimes they even skip entire numbers and when we go back as attorneys and ask -- |
|---|---|
| The Court: | Mr. Privateer, she sat there all day yesterday and heard people, a number of people say that this relative or that had been convicted of a crime. And I expect that it happened in this panel itself, so however, it's still my considered opinion she answered the questions appropriately, as far as how she would treat this case if she were allowed to sit. |
| Mr. Winter: | I'm sorry to interrupt, Judge, but that's exactly my concern. You say she answered appropriately the questions she chose to answer. I don't know now, based on my knowledge of her and her family, I don't know how accurate she was responding to those questions because she failed to respond to the other one, and that's the concern I have. That's the fundamental concern. I can't trust anything she said, because I know for a fact that she has members of her family prosecuted and she never mentioned it. And that questionnaire is in front of the jurors and when she skips over it, as Mr. Privateer says, and singles out her brother as a victim, herself as a victim, her son as a victim, but never makes mention of anybody in her family being prosecuted, I have to now be very concerned about how truthful she's being to answer any question, and so when you say, well, she answered the questions, you know, yeah, but what does that mean? She could be saying anything she wants. I can't trust her, that's my problem, and I don't know what she's going to – she took an oath, I don't know what she's going to do with that oath. |
| The Court: | You can challenge her peremptorily. |
| Mr. Winter: | I'm challenging her for cause because I have reason to believe she's not fit to be a juror for the reasons I've described, and that's what the challenged for cause are all about. She's not fist to be a juror based on the response she gave." |
| The Court: | You certainly could have asked her that question. |
| Mr. Winter: | Judge, with all due respect, I didn't want to. I asked her an awful lot of questions about her family, I didn't want to. |
| The Court: | I think it's incumbent upon you to ask her the question if you're going to challenge her on that basis. I agree with you, she obviously was withholding information. I'm going to deny your challenge for cause. You can challenge her peremptorily. |
| T.461-64. | |

co-counsel, he "ultimately determined" to remove her peremptorily he "felt . . . that she was being evasive and because she didn't respond to the questions . . .  indirectly asked of her by the Court about people in her family having been accused of crime[.]" T.470. The prosecutor stated that based on the "totality of the circumstances,"he could not "trust her as a juror to do what she was required to do as a juror, and that decision . . . ha[d] nothing to do with her race[.]" T.470-71. The prosecutor reiterated that he was relying on his reason for exercising a for-cause challenge–namely, that he knew her two brothers had been prosecuted by the district attorney's office he represented. In opposition, defense counsel argued that a pattern of discrimination existed and that the juror's failure to respond to a question in the general questionnaire given to each juror did not prove that she intentionally withheld information; she may have simply neglected to answer. T.472. The trial judge stated, "I don't really feel there's been pattern established by the challenge of the first black [juror], and even though it's the only black juror on this panel, nonetheless assuming that it is [a pattern] for the purpose of the argument here, I find [the prosecutor's] response to be racially neutral." T.473.  The trial court continued, "It just happened that this one black juror happens to come from a family of people that were known criminals, at least [her brothers] James and Carl were for sure." T.474.

The Second Circuit has held that race- or gender-neutral explanations based on the fact that a relative of a prospective juror had been arrested or convicted of a crime are acceptable under *Batson*. *See Green v. Travis*, 414 F.3d at 300-01 (2d Cir. 2005) (accepting as a satisfactory race-neutral reason for peremptory strike the prosecutor's explanation that the prospective jurors had relatives who had been convicted of drug offenses; stating that such a reason "relied on the types of evidence that this Court has approved in support of establishing the racial neutrality of a

peremptory challenge"); *Jordan v. Lefevre*, 293 F.3d 587, 594 (2d Cir. 2002) ("Nor do we see

error in the district court's finding that [the prosecutor's] exercise of five of the State's

peremptory challenges against blacks was not motivated by their race. [The prosecutor] offered

race-neutral reasons for each of those challenges. It was not impermissible for the district court to

credit his explanations that he viewed [one juror] as potentially having animosity toward the

police because of [that juror]'s view that the police had unfairly arrested and beaten his

brother[.]"); *Barbara v. Goord*, No. CV-98-4569, 2001 WL 1776159, at *6 (E.D.N.Y. Dec. 27,

1991) ("Prosecutors routinely challenge [jurors whose family members had been recently

prosecuted by the authorities], regardless of race, fearing bias against the authorities."); *United

States v. Rudas*, 905 F.2d 38, 41 (2d Cir.1990) (finding no purposeful discrimination in exercise

of peremptory strike where juror believed that officer had used "unnecessary" force during a

police sweep; the government "had a basis for believing that [the juror] might be prejudiced

against law enforcement officers and thus not be an impartial juror").

    In Montana's case, the prosecutor's proffered reason was race-neutral, clear, and not

otherwise vague or facially questionable. *Green*, 414 F.3d at 301  (citing, *inter alia*, *Batson*, 476

U.S. at 98 (holding that in articulating race-neutral justifications for exercising peremptory

strikes, the prosecutor may not simply deny "that he had a discriminatory motive" or affirm his

"good faith" in selecting jurors, but rather must "articulate a neutral explanation related to the

particular case to be tried"). The reason was based on his personal knowledge, gleaned during his

tenure at the district attorney's office, that James and Carl had been criminally charged by that

office on multiple occasions. Moreover, the trial judge himself had personal knowledge that the

jurors two brothers had been prosecuted in Niagara County Court. Thus, the record more than

amply supports the prosecutor's clear, specific, and legitimate reason for peremptorily striking juror Mallory because she was not being truthful about the criminal histories of her family members was more than amply supported by the record.  Indeed, on these facts it would have been appropriate for the trial judge to have granted prosecutor's challenge for cause.

Turning to the third step of the *Batson* inquiry, a trial court's finding as to whether the prosecutor intentionally discriminated on the basis of race when exercising a peremptory strike is a factual finding entitled to appropriate deference by a reviewing court. *Batson*, 476 U.S. at 98 n. 21 (citation omitted); *accord*, *e.g.*, *Jordan v. Lefevre*,293 F.3d 587, 593 (2d Cir. 2002). Since the trial judge's conclusions during the type of inquiry contemplated by *Batson* "largely will turn on evaluation of credibility," the Supreme Court has instructed that reviewing courts "ordinarily should give those findings great deference." *Id.* (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575-76 (1985)). Montana has provided no basis for this Court to reject the trial judge's findings. The trial court heard extensive argument on both the for-cause and peremptory strike of juror Mallory, and gave defense counsel the opportunity to make a full record. Furthermore, as noted above, the trial judge actually knew that the juror's two brothers had extensive criminal histories in his court; he had personal knowledge of the prosecutor's proffered race-neutral reason and therefore was uniquely able to judge the prosecutor's credibility. In sum, the trial court conducted a "meaningful inquiry into 'the decisive question . . . whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" *Jordan v. LeFevre*, 206 F.3d 196, 201 (2d Cir. 2000) (quoting *Hernandez v. New York,* 500 U.S. 352, 365 (1991).

Accordingly, the Court recommends that habeas relief not issue on petitioner's *Batson* claim.

-30-

### 2.      Petitioner's claim of prosecutorial misconduct is without merit.

Montana contends that during summation the prosecutor made six remarks which

allegedly caused substantial prejudice and warrant reversal of his conviction. On direct appeal,

the Appellate Division held that

> [t]he contention of defendant that he was denied a fair trial by prosecutorial
> misconduct is without merit. The alleged misconduct was either fair comment on
> the evidence or was properly addressed by the court's curative instructions, which
> alleviated any prejudice to defendant[.] In any event, . . . review of the evidence
> indicates that without the conduct the same result would undoubtedly have been
> reached and thus reversal on the ground of prosecutorial misconduct is not
> warranted[.]

*People v. Montana*, 298 A.D.2d at 935 (internal citations and quotation marks omitted).

Both the Second Circuit and the Supreme Court have "note[d] the narrow standard

governing federal habeas corpus review of a petition brought by a state prisoner," which

appropriately is "'the narrow one of due process, and not the broad exercise of supervisory

power.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*,

416 U.S. 637, 642 (1974)); *accord, e.g.*, *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990).

The Supreme Court accordingly has instructed federal habeas courts reviewing claims of

prosecutorial misconduct brought by state petitioners to distinguish between the "ordinary trial

error of a prosecutor and that sort of egregious misconduct . . . amount [ing] to a denial of

constitutional due process." *Donnelly*, 416 U.S. at 647-48  (citations omitted); *accord Floyd*, 907

F.2d at 353. *Donnelly*'s standard requires the federal habeas court to ask whether "'the

prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally

unfair.'" *Floyd*, 907 F.2d at 353 (quoting *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986)

(citing *Donnelly*, 416 U.S. at 645 and, *inter alia*, *United States v. Modica*, 663 F.2d 1173 (2d Cir.

1981), *cert. denied*, 456 U.S. 989 (1982)); *see also Garofolo*, 804 F.2d at 206 (noting that

harmless error doctrine may be applicable to prosecutorial misconduct involving statements to

the jury) (citing *United States v. Hasting*, 461 U.S. 499, 510-12 (1983)). Given the narrow scope

of habeas review of prosecutorial misconduct claims, a habeas petitioner must show "that he

suffered actual prejudice because the prosecutor's comments during summation had a substantial

and injurious effect or influence in determining the jury's verdict." *Tankleff v. Senkowski*, 135

F.3d 235, 252 (2d Cir. 1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994) (internal

quotation marks and citation omitted in original)).  In making the determination of whether a

defendant has suffered "actual prejudice" as a result of the prosecutorial misconduct, the Second

Circuit has examined "'the severity of the misconduct; the measures adopted to cure the

misconduct; and the certainty of conviction absent the improper statements.'" *Tankleff*, 135 F.2d

at 252 (quoting *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d at 1181)

(internal quotation marks omitted); citing *United States v. Parker*, 903 F.2d 91, 98 (2d Cir.

1990)).

     In the first instance of alleged misconduct, Montana contends that the prosecutor

"editorialized" by telling the jury the defendant has "nothing to lose and everything to gain by

that approach so why not fabricate the story to the police?" Defense counsel objected to the

"attack on the defense[,]"and the trial court overruled the objection, agreeing with the

prosecutor's response that it was "a comment on [petitioner's] making a statement, Judge, and he

made a statement which is in evidence." T.1705.  A prosecutor "should not vouch for his own

witness' credibility," *United States v. Sanchez Solis*, 882 F.2d 693, 697 (2d Cir. 1991) (citing

*United States v. Modica*, 663 F.2d 1173, 1178-79 (2d Cir. 1981), *cert. denied*, 456 U.S. 989

(1982)), or "state his personal belief as to the defendant's guilt or innocence," *id.* (citing see *United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985). The Second Circuit has approved, however, a prosecutor's "limited, non-inflammatory use . . . of terms such as 'lies' to describe testimony that is challenged as untruthful," *id.* (citing *United States v. Resto*, 824 F.2d 210, 212 (2d Cir.1987)). In light of this precedent, Montana cannot show that the prosecutor's suggestion that he might have "fabricated" his story to the police was an improper statement as a matter of federal law. *See Sanchez Solis*, 882 F.2d at 697 (rejecting appellant's contention that "prosecutor acted improperly when he suggested that Sanchez had lied on the witness stand" because review of the Government's closing argument "convince[d]" the court "that the prosecutor's comments were not inflammatory").

Montana also complains that the prosecutor erred in suggesting the jury consider how blood spatters got on the pavement, the doorknob, and the door frame. This appears to have been an effort to counter an argument by defense counsel that blood found on a doorknob and door frame was put there by the emergency personnel. In response, the prosecutor discussed testimony that the paramedics on the scene attended to the victim carefully and did not touch anything. He stated, "We asked everybody, did you disturb the scene, touch anything? No, we didn't touch anything. But he [defendant] offers to you only that maybe one of those people touched the door and the frame." T.1720. Defense objected on the basis that this was "burden shifting," stating, "I don't have a burden to prove anything." The prosecution "agree[d] . . . [that] [the defense] has no burden to prove anything" but defense counsel, "in his closing argument offered no suggestion as to how that blood got there." The trial court overruled the objection. T.1720-1.

The Second Circuit has held that it is "established that the government may comment on

a defendant's failure to call witnesses to support his factual theories." *United States v. Bautista* (citing *United States v. McDermott*, 918 F.2d 319, 328 (2d Cir. 1990), *cert. denied*, 500 U.S. 904 (1991); *United States v. Gotchis*, 803 F.2d 74, 81 (2d Cir. 1986)). A prosecutor crosses the line into improper comment, however, by "suggest[ing] that the defendant has the burden of producing evidence." *Id.* (citing *United States v. Parker*, 903 F.2d 91, 98 (2d Cir.) (stating that it is impermissible for the prosecutor to "suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever"), *cert. denied*, 498 U.S. 872 (1990)). In *Bautista*, the prosecutor commented, "The defense does not have a burden of proving anything to you but when they do make an argument to you . . . you don't have to accept it. At that point they are obligated to come forward with evidence." *Bautista*, 23 F.3d at 733. The Second Circuit described the challenged statement as "inapt" but held that when it was "considered in context would not have been understood by a reasonable jury as anything more than an argument that the jury need not believe uncorroborated defense theories." *Id.*

Judging the comment complained of by Montana in the context of his trial, and after comparing it with the remark found unobjectionable in *Bautista*, the Court concludes that the remark did not amount to misconduct. Unlike the prosecutor in *Bautista*, the prosecutor here did not state, outright, to the jury, that the defense was "obligated" to come forward with proof. Such statements, the Second Circuit has instructed, "should [be] avoid[ed]."*Id.*  Even assuming that the prosecutor's remark here did tend to impermissibly shift the burden of proof, the Court notes that the Second Circuit in *Bautista* held that the trial court's general instruction that the government bore the burden of proof as to every element and that the burden never shifted to the defendants "undoubtedly clarified" "whatever ambiguity may have been caused by the remark

with respect to the burden of proof[.]"

Montana claims that another instance of burden shifting occurred when the prosecutor commented that the testimony of Reuben Byrd and Walter Fraser, if believed, was "horrible news" for petitioner. The prosecutor stated that petitioner had "to do what [he] [could] to discredit" them. T.1739. Defense counsel objected on the basis of burden shifting, and the trial court informed the jury that "[t]he defendant has no burden of proof, no obligation whatsoever." T. 1739. The prosecutor continued to comment on the credibility of Byrd and Frasier, but in an unobjectionable manner.

It is clear that after assessing this comment under the three *Modica* factors, it did not prejudice Montana's right to a fair trial. It was one brief remark to which the trial court sustained defense counsel's objection. The trial court took the opportunity to issue a curative instruction at the time and, during his general charge to the jury, the trial judge explained at length the presumption of innocence and the burden of proof to the jury. The trial court's curative instructions during summation and the general jury charge were sufficient to quell any question that might have been raised in the jury's mind regarding burdens of proof based on the prosecutor's brief comment, and thereby mitigated any potential prejudice. *See, e.g.*, *United States v. Mapp*, 170 F.3d 328, 337-38 (2d Cir. 1999) ("Concededly, the prosecutor's comments may have straddled the fine line between arguing that the government's case has been largely uncontradicted and impermissibly suggesting that the defendant has an obligation to testify or that he has any burden of proof. Nevertheless, we believe that any prejudice arguably caused by the prosecutor's remarks was substantially eliminated by a curative instruction promptly given by the trial judge."); *Garofolo v. Coomb*, 804 F.2d at 206 & n. 3 (holding that jury instructions

relating generally to attorney summations cured specifically improper prosecutorial remarks); *United States v. Millar*, 79 F.3d 338, 344 (2d Cir. 1996) ("Even if the prosecution's [burden-shifting] remark was inappropriate-hardly a self-evident proposition-it was of little significance and was instantly cured by the district court. It did not, therefore, 'substantially prejudice' [defendant]"). Finally, as discussed more fully below, the proof against Montana was overwhelming, which militates against finding that this remark denied him of his right to a fair trial.

Montana also contends that the prosecutor improperly interjected his own personal beliefs about the evidence at trial into his summation by using the personal pronoun, "I". In particular, Montana complains about the prosecutor's statement, "I don't know about you, but I'm sitting here thinking to myself, wait a minute, if you're not supposed to move [the victim's] head–." T.1725. The trial judge overruled defense counsel's objection but the prosecutor rephrased his statement to one which appropriately did not contain "I," and asked the jury to "consider this." T.1725. The Second Circuit has cautioned against the excessive use of the personal pronoun "I" as "poor practice," noting that it is "strictly improper" insofar as it makes an issue of the prosecutor's credibility or implies the existence of extraneous proof. *United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996); *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995). For a prosecutor to use the phrases 'I submit that' and 'I think' when asking a jury to draw inferences based on common sense, however, is entirely acceptable. *Id.* That is what occurred in the present case, and Montana has not shown that this isolated remark by the prosecutor–which he re-phrased to eliminate the personal pronouns–amounted to an error of federal constitutional law. *See id.*

-36-

Montana contends that the prosecutor committed an impropriety when he told the jury that the intentional murder count was included because of "the severity of the injuries to this defendant [sic]." T.1757. The defense objected to the remark, arguing that why a particular offense was or was not charged in an indictment involved the prosecutor "speculating on something that happened that [was] outside of his control." T. 1758. The trial judge overruled the objection, finding that it was "argumentation." T.1758. Montana has cited no federal or state caselaw standing in support of his contention that this remark constituted improper argument. The comment followed the prosecutor's concession that he had to prove, partially through the use of circumstantial evidence, that Montana intentionally murdered the victim. The prosecutor was acknowledging that the jurors might be "a little uncomfortable" or find it "hard to believe that these guys actually . . . intended to take his life" based inferences drawn from circumstantial evidence. T.1757. Looking at the remark in context, the Court cannot find that it was improper.

Finally, Montana contends that the prosecutor improperly appealed to the juror's emotions and sympathies. Defense counsel objected when the prosecution said to the jury, "I submit to you, ladies and gentlemen, I submit to you that you have the guilty party in the courtroom today. You need now only have the courage to do something about it. The choice is yours to let him go or to find him guilty." T.1756. The trial court sustained the objection to this plainly improper remark and told prosecutor, "Stay away from that." *Id.* at 1756-7. After summations were concluded, petitioner moved for a mistrial based on all of the instance of prosecutorial conduct to which he had objected and as to which the trial court had overruled the objections. T.1760. This application was denied, but the trial judge stated, "I'll address the sympathy factor in my charge, specifically, with reference to the last remark." T.1760.

Prosecutorial remarks or tactics "calculated to inflame the passions or prejudices of the jury" are improper. *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (citing *Modica*, 663 F.2d at 1180)); *see also United States v. Young*, 470 U.S. 1, 10 & n.7 (1985) (citing ABA Standards for Criminal Justice 4-7.8(c), p. 4•97) ("A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury."). The Court agrees with Montana that this remark was improper and outside the bounds of proper argument. However, under the circumstances here, the comment does not warrant reversal of the conviction.

Looking at the first *Modica* factor, the Second Circuit "has repeatedly stated that the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." *Elias*, 285 F.3d at 191 (citations omitted). As discussed above, most of the other allegedly improper remarks did not amount to misconduct by the prosecutor, so this was an isolated remark during a trial that was not "dominated by passion or prejudice," *Modica*, 663 F.2d at 1181. Second, in its charge to the jury, the trial court gave a thorough curative instruction telling the jury that emotional considerations such as sympathy for any of the parties could not play a role in the verdict.[10] T.1821-22. The judge also instructed the jury that the arguments of counsel were not evidence in the case. The Court believes that, under *Modica*, the specific instruction to the jury on the issue of sympathy was a sufficient response to the prosecutor's conduct. *See Elias*, 285 F.3d at 192 (stating that although pattern instruction that has been held

---

[10]     "I instructed you I think at different times during this trial that sympathy or bias or prejudice or any of the other outside emotional considerations are not to be considered by you and must be stricken from your mind, and that whether you feel sorry for anybody in this case, whether it be for the victim, the defendant, or the members of the family, you should not let that in any way affect your deliberations, because you have sworn to both sides and to me as the judge that you will consider only evidence in arriving at your verdict, and obviously if you're thinking about things such as sympathy or prejudice, they have no place in this courtroom, or in your deliberations." T.1821-22.

insufficient in response to specific misconduct by the prosecutor, the problem at Elias' trial was "of lesser severity than in *Modica*," 663 F.2d at 1182 and therefore "needed less in the way of a cure"; prosecutor had "grossly mis-characterized" defense argument in a way that was "clearly designed to inflame the passions of the jury and was an improper tactic"). Third, Montana cannot make the showing of "substantial prejudice" required by the third *Modica* factor because he has not demonstrated that "absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), [he] would not have been convicted." *Elias*, 285 F.3d at 192. To the contrary, the proof at trial against Montana was extremely strong: Montana was seen by prosecution witnesses watching the incapacitated victim being helped to his apartment after coming home. Minutes after asking one of the victim's neighbors to borrow a crowbar, Montana was seen at the crime scene of leaning over the victim's prone body; when he was spotted by one of the neighbors, Montana fled along with his co-defendant, Rogers. The neighbor checked on the victim and found him unconscious and bleeding from the ear, and his pockets had been turned inside out. The medical evidence presented by the prosecution compellingly established that the victim died as the result of multiple blunt-force traumas to the skull as a result of being struck forcefully in the head with some type of blunt object. In light of the nature and extent of the injuries sustained by the victim, the defense's medical expert's opinion that he died as a result of a simple fall was fairly implausible. Moreover, that theory was not supported by the physical evidence from the crime scene. Montana admitted to the police and to other prosecution witnesses that he and his co-defendant Rogers formed a plan to, and did rob, the victim by "running his pockets" or going through his pockets looking for money. Montana admitted that he got $26 as a result.

The Second Circuit has explained that whether or not a "substantial prejudice" resulted from improper prosecutorial remarks often depends upon the strength of the government's case: "[I]f proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal." Because the proof at trial against him was "so strong" that the jury "in all probability would have found him guilty even absent the improper comment[,]" *Modica*, 663 F.2d at 1182, petitioner accordingly did not suffer "substantial prejudice." *Accord, e.g.*, *Elias*, 285 F.3d at 192. Thus, although the remark was plainly improper and the prosecutor should have refrained from making it, the comment did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181; *accord Modica*, 663 F.2d at 1181. The Court accordingly recommends that habeas relief not issue on Montana's claim of prosecutorial misconduct.

### 3.    Ineffective assistance of trial counsel

Montana contends that his trial counsel failed to render effective assistance as guaranteed by the Sixth Amendment because counsel (1) "abandoned" his "meritorious [motion for a] trial order of dismissal" after initially making it at the close of the prosecution's case; and (2) failed to "properly address whether there was a Fourth Amendment violation with regard to Petitioner's arrest." *See* Pet. at 3-6, ¶¶A-H (Dkt. #1); Pet'r Reply Mem. at 20-21 (Dkt. #13). In a different section of his Reply Memorandum of Law, Montana "request [sic] this Court review trial counsel [sic] performance to determine if the 'cumulative effect' deprived him of a fair trial." *Id.* On direct appeal, the Appellate Division held that "[c]ontrary to the contention of the defendant in his *pro se* supplemental brief, he was not denied effective assistance of counsel[.]" *People v.*

*Montana*, 298 A.D.2d at 935 (citing, *inter alia*, *People v. Baldi*, 54 N.Y.2d 137, 147 (N.Y. 1981)).

To establish ineffective assistance of counsel under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Montana must prove that counsel's performance was constitutionally deficient–that he "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." In addition, Montana must demonstrate that he actually was prejudiced by counsel's erroneous acts or omissions, which requires showing that the errors "were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *See Strickland*, 466 U.S. at 687; *accord, e.g.*, *Davis v. Greiner*, 428 F.3d at 87 (2d Cir.  2005). In assessing the objective reasonableness of counsel's conduct under the first prong of the *Strickland* test, the court must "consider the circumstances counsel faced at the time of the relevant conduct and to evaluate the conduct from the counsel's point of view," and must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Davis v. Greiner*, 428 F.3d at 88.  The "prejudice prong is established by showing that there is a 'reasonable probability' that, but for the deficiency, 'the result of the proceeding would have been different.'" *Clark v. Stinson*, 214 F.3d 315, 321 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 694). A petitioner's failure to make the required showing on either prong of the test will defeat his ineffective assistance claim. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

The Court first examines the issue of trial counsel's failure to renew his motion for a trial

order of dismissal motion after the defense rested. Montana's argument is that "the evidence in this case is far from beyond a reasonable doubt[,]" which the Court construes as a contention that there was a "reasonable probability" that the outcome of his appeal would have been different had trial counsel properly preserved the evidentiary-sufficiency issues. As discussed above in this Report and Recommendation, petitioner waived this issue as a matter of New York state law because he presented evidence in his defense at trial.  Therefore, a renewed motion for a trial order of dismissal arguably would have been futile, *see id.*, which does not support a finding that trial counsel was professionally unreasonable.

Even if trial counsel had nevertheless renewed the motion and the state appellate court had decided to overlook this rule barring review of evidentiary insufficiency claims where a defendant has presented evidence at trial in his behalf, Montana cannot show a "reasonable probability" of a more favorable outcome. In other words, Montana cannot demonstrate it was reasonably probable that the court would have overturned the verdict on appeal based on his argument that the evidence to support the robbery conviction or the felony murder conviction was insufficient.

The standard for proving that evidence to support a conviction was legally insufficient is the same under both New York state and federal law. *People v. Contes*, 60 N.Y.2d at 620-21 ("The standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (quoting *Jackson v. Virginia*, 443 U.S. at 319 (emphasis in original)). As discussed above in this Report and Recommendation, there was more than sufficient evidence presented as to each element of

both the robbery charge and the felony murder charge.  The Court thus cannot find that there is a

"reasonable probability" that the outcome of his trial or his appeal would have been different but

for counsel's alleged error in failing to renew the motion to dismiss. Consequently, Montana

cannot show that he was in any way prejudiced by  trial counsel's failure to renew the arguably

futile motion for a trial order of dismissal. Accordingly, the Court recommends that this aspect of

petitioner's ineffective assistance claim be denied.

Montana next claims that trial counsel "failed to properly address whether there was a

Fourth Amendment violation with regard to Petitioner's arrest." Pet. at 6 (Dkt. #1). He provides

no other facts or legal argument in support of this claim, and on that basis alone, it is too vague to

state a colorable ground for habeas relief. Moreover, his assertion that trial counsel failed to

challenge the constitutionality of his arrest is belied by the record: trial counsel made a pre-trial

motion to suppress the physical evidence found at his friend LaShawn Walker's apartment as

well as the statement made by petitioner to the police after his arrest. Both motions were denied

by the trial court, and the state appellate court found that the evidence seized was taken legally,

as petitioner lacked standing to contest the warrantless search, and in the alternative, that

LaShawn Walker, the tenant of the apartment, tacitly consented to police officers' entry. *See*

*People v. Montana*, 298 A.D.2d at 934 (citations omitted). The state courts also found that the

police has probable cause to arrest the petitioner and his suppress of his statement was

unwarranted. *See id.* (citations omitted).

In view of the record evidence, it is clear that trial counsel discerned and properly raised

the salient issues on his motion to suppress. Thus, Montana has not shown that trial counsel

performed deficiently in his efforts to suppress petitioner's arrest and the physical evidence

seized as a result of the warrantless search. With respect to the prejudice prong, the Court finds it

significant that Montana does not offer any alternative arguments that trial counsel should have

made in support of the motion to suppress and therefore has completely failed to demonstrate

how the outcome of the motion to suppress would have been different but for trial counsel's

alleged errors. Moreover, contrary to Montana's claims, trial counsel properly raised the

significant issues before the suppression court–he cannot be faulted simply because the courts did

not agree that they had merit. *See Henry v. Poole*, 409 F.3d 48, 58 (2d Cir. 2005) ("In applying

[the *Strickland*], courts should not confuse true ineffectiveness with losing trial tactics or

unsuccessful attempts to advance the best possible defense."), *cert. denied*, __ U.S. __, 126 S. Ct.

1622 (2006).

In short, Montana has failed to show that trial counsel was professionally unreasonable in

his handling of the motion to suppress or that if he had raised different, unspecified issues, there

is a reasonable probability that the suppression court would have ruled in Montana's favor. The

Court accordingly recommends that this aspect of Montana's ineffective assistance of trial

counsel claim be denied as well.

To the extent that Montana asserts a claim that the cumulative errors of trial counsel

warrant reversal of his conviction, *see* Pet'r Reply Mem. at 22 (Dkt. #13), the Court rejects it. In

analyzing a  petitioner's claim that the cumulative effect of trial counsel's alleged ineffectiveness

deprived him of Sixth Amendment right to effective representation, the impact of counsel's

errors is "assess[ed] . . . in the aggregate." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001)

(citing *Strickland*, 466 U.S. at 695-96 ("[A] court hearing an ineffectiveness claim must consider

the totality of the evidence before the judge or jury. . . . [A] verdict or conclusion only weakly

supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.")). As noted above, the Court does not agree that alleged deficiencies on the part of trial counsel actually were errors at all. Furthermore, as discussed above, the verdict against Montana had "overwhelming record support," *Strickland*, 466 U.S. at 696. Thus, even assuming that counsel erred in the way that Montana asserts, Montana has not demonstrated that he was prejudiced because he cannot demonstrate that the outcome of his trial was "reasonably likely [to] have been different absent the errors," *id.*, by trial counsel. In sum, there is no basis in the record to support Montana's contention that trial counsel failed to provided him"professionally competent assistance[,]" *id.* at 690. Accordingly, the Court recommends dismissal of Montana's claim regarding the cumulative effect of trial counsel's errors.

    **4.    Petitioner's claim that his sentence was harsh and excessive is not cognizable on federal habeas review.**

Montana was sentenced to concurrent terms of imprisonment, the longest of which was twenty-five years to life. He claims that the "maximum sentence of state incarceration imposed by the Trial Court was unduly harsh and excessive and unnecessarily retributive" because he is twenty-five years-old, has completed 10th grade, "maintains his innocence with respect to assault in this matter[,]" and "maintains strong ties to his family and has supported and maintained regular contact with his children." Pet. at 6, ¶11-H.

A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977) (petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948). A challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *accord Ross v. Gavin*, 101 F.3d 687 (2d Cir. 1996) (unpublished opinion).

Montana was convicted of second degree (felony) murder pursuant to Penal Law § 125.25(3), a class A-I felony. *See* N.Y. Penal Law § 125.25(3). The trial court, pursuant to Penal Law § 70.00(1), was required to impose an indeterminate sentence, with the maximum term in accordance with Penal Law § 70.00(2) and the minimum term in accordance with Penal Law § 70.00(3). *See* N.Y. Penal Law § 70.00(1). For a class A-I felony such as second degree (felony) murder, Section 70.00(2) states that the "maximum term of an indeterminate sentence . . . [f]or a class A felony . . . *shall be life imprisonment*[.]" N.Y. Penal Law § 70.00(2)(a) (emphasis supplied). Thus, with respect to the maximum term of Montana's incarceration, the trial court was required under Penal Law § 70.00(2)(a), to impose a term of life imprisonment. Section 70.00(3) provides that the minimum period for a class A-I felony "shall not be less than fifteen years *nor more than twenty-five years*[.]" N.Y. Penal Law § 70.00(2) (emphasis supplied). Montana's minimum term of imprisonment was fixed at twenty-five years, and therefore did not exceed the maximum sentence authorized by statute for the class A-I felony for which he was convicted. Because Montana's indeterminate sentence of twenty-five years to life incarceration

-46-

was with the range authorized by New York's Penal Law, his claim that his sentence was harsh and excessive does not present a cognizable federal claim. *See Townsend v. Burke*, 334 U.S. at 741 ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."). Accordingly, the Court recommends that it be dismissed.

**5.       Ineffective assistance of appellate counsel**

In his Reply Memorandum of Law (Dkt #13), Montana asserts for the first time that appellate counsel was ineffective because he was laboring under a conflict of interest because "the same firm that handled Montana's trial perfected his appeal." Pet'r Reply Mem. at 22 (Dkt #13). Montana states that "[a]ppellate counsel attempted to clean up trial counsel's performance" but due to the conflict of interest, "the argument obviously would not be strong as needed." *Id.* Montana does not provide any further argument regarding appellate counsel's ineffectiveness. As mentioned above in this Report and Recommendation, this claim is unexhausted because Montana has failed to raise it in any of his applications in state courts challenging his conviction

AEDPA now gives the Court discretion to deny on the merits habeas petitions containing unexhausted claims, but it does not require the Court to determine unexhausted claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Under the circumstances here, the Court believes that the appropriate course is to deny the unexhausted ineffective assistance of counsel claims on the merits. Section 2254(b)(2) does not contain the standard for determining when a court should dismiss a petition on the merits instead of insisting on complete exhaustion, and neither the Supreme Court nor the Second

Circuit has established what standard a district court should use to determine when to dismiss a petition on the merits rather than requiring complete exhaustion. A number of district court decisions in this Circuit have utilized a "patently frivolous" test for dismissing unexhausted claims under Section 2254(b)(2). *E.g.*, *Hammock v. Walker*, No. 99-CV-6354L(FE), 2002 WL 31190945, at *2 (W.D.N.Y. Sept. 17,  2002) (Larimer, J.), *Wilson v. Goord*, No. 00 Civ. 4849(LTS), 2004 WL 226149, at *6 (S.D.N.Y. 2004)). A minority of courts have expressed doubts as to whether meritless claims must meet the more exacting standard of "patently frivolous" to warrant denial, and have dismissed unexhausted claims under Section 2254(b) as "non-meritorious" when it was "perfectly clear" that the petitioner did not "raise even a colorable federal claim." *E.g.*, *Basnight v. Keane*, No. 99-CV-5907(FB), 2001 WL 901139, at *5 n. 1 (E.D.N.Y. July 31, 2001); *Tatta v. Miller*, No. 05-CV-1205 (FB)(MG), 2005 WL 2806236, at *3 (E.D.N.Y. Oct. 27, 2005)). In many instances, however, the district courts have declined to adopt a particular standard, instead dismissing the unexhausted claims after finding that they failed under either standard (*i.e.*, "patently frivolous" or "nonmeritorious"). The Court notes that the Second Circuit opted for the "patently frivolous" test in *Jones v. Senkowski*, 2001 WL 1230800, at *4 (2d Cir. Oct. 5, 2001), but that decision was later vacated and withdrawn. *Jones v. Senkowski*, No. 00-2145, 2002 WL 246451 (2d Cir. May 22, 2002), *amended by Jones v. Senkowski*, No. 00-2145, 42 Fed. Appx. 485, 2002 WL 1032589 (2d Cir. May 22, 2002), *cert. denied*, 537 U.S. 1177 (2003)). Measuring this ineffective assistance claim against the "patently frivolous", the "non-meritorious", or even a pre-AEDPA standard, there is no question that it should not provide a basis for habeas relief. The Court accordingly recommends its dismissal based on the following discussion.

The Supreme Court has articulated the standard for assessing ineffective assistance of counsel claims based on conflict of interest as follows: "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *accord Strouse v. Leonardo*, 928 F.2d 548, 552 (2d Cir. 1991). As the Second Circuit has explained, "the mere possibility of a conflict is not enough to upset a conviction; the defendant must identify an actual conflict that impeded his lawyer's representation." *Strouse*, 928 at 552 (citing *United States v. Jones*, 900 F.2d 512, 519 (2d Cir.), *cert. denied*, 498 U.S. 846 (1990); *Kirkpatrick v. Butler*, 870 F.2d 276, 284 (5th Cir. 1989) (no conflict where defense counsel had friendship with and had in the past represented members of murder victim's family), *cert. denied*, 493 U.S. 1051 (1990); *Crisp v. Duckworth*, 743 F.2d 580, 588 (7th Cir. 1984) (no conflict where defense counsel represented murder victim in unrelated criminal action and informed defendant of the prior representation), *cert. denied*, 469 U.S. 1226 (1985)). Montana has not come close to establishing that the possibility of a conflict existed based on the mere fact that the same trial counsel appellate counsel were both from the same firm.

Furthermore, to the extent that Montana claims that appellate counsel was ineffective in failing to argue that trial counsel provided deficient representation, the Court disagrees. The *Strickland* two-pronged standard applies equally to claims of ineffective assistance of appellate counsel. *E.g.*, *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993). In order to prove that appellate counsel's failure to raise a meritorious argument "fell outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, it is insufficient for the petitioner to show "merely that counsel omitted a nonfrivolous argument, for

counsel does not have a duty to advance every nonfrivolous argument that could be made."
*Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Jones v. Barnes*, 463 U.S. 745, 754
(1983)). Whether the neglected appellate issue is based on federal or state law, the burden rests
on Montana to show "that counsel omitted significant and obvious issues while pursuing issues
that were clearly and significantly weaker." *Id.*

In evaluating whether a petitioner was prejudiced by appellate counsel's deficient
performance, the court must determine whether there is a "reasonable probability that the
outcome of the proceeding would have been different." *Mayo*, 13 F.3d at 534. "A reasonable
probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466
U.S. at 694; *accord Mayo*, 13 F.3d at 534. The "outcome determination" involved in the
prejudice analysis, "unlike the performance determination, may be made with the benefit of
hindsight." *Mayo*, 13 F.3d at 534 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). To
establish prejudice in the context of appellate counsel's performance, a petitioner must
demonstrate that "'reasonable probability'" that the omitted claims "'would have been
successful'" before the state's highest court on appeal. *Mayo*, 13 F.3d at 534 (quoting *Claudio*,
982 F.2d at 803 (footnote omitted in original)).

Here, Montana plainly cannot establish either prong of the *Strickland* standard. First,
appellate counsel reasonably chose not to raise a claim that trial counsel was ineffective in failing
to renew his trial order of dismissal. As discussed above, the rule in New York state is that a
defendant who presents proof at trial subsequently waives appellate review of any claims of
evidentiary insufficiency. Because it arguably would have been a futile application for trial
counsel to make, it would have been extremely difficult to show that trial counsel acted

unreasonably. Thus, appellate counsel made a well-reasoned, strategic decision to forego this extremely weak in favor of the relatively stronger ones raised on appeal. Moreover, as discussed above, the evidence against Montana was more than sufficient to support both the robbery conviction and the felony murder conviction as a matter of both federal and state law, meaning that Montana cannot demonstrate a reasonable probability that the omitted claim would have been successful on appeal.

Appellate counsel, furthermore, reasonably chose not to argue that trial counsel's motion to suppress Montana's arrest and the physical evidence seized was deficient. As discussed above, trial counsel performed competently in this regard, raising the appropriate issues in connection with the motion to suppress. Again, because this was not a strong issue, appellate counsel's decision not to include it was within the range of professionally competent assistance. Moreover, appellate counsel *did* raise a stand-alone claim premised on the warrantless arrest and search, so the appellate court had occasion to review the facts underlying the motion to suppress. That court concluded, however, there was no merit to the claim. Having rejected Montana's contentions regarding the warrantless arrest and search, there is no reasonable probability that the state appellate court would have held trial counsel ineffective for failing to make additional, unspecified arguments in connection with the motion to suppress and overturned Montana's conviction on that basis. Accordingly, Montana cannot demonstrate that he was prejudiced by the omission of this claim. The Court therefore recommends that Montana's claim of ineffective assistance of appellate counsel be dismissed.

## V.    Conclusion

For the reasons set forth above, the Court recommends that petitioner Donald Montana's

petition for a writ of habeas corpus filed by  (Docket No. 1) be **DENIED**. Because the Court

finds that Montana has not made a "substantial showing of the denial of a constitutional right"

pursuant to 28 U.S.C. § 2253(c)(2), it recommends that a Certificate of Appealability be

**DENIED** as to all of Montana's claims.

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  May 30, 2007
Rochester, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1ˢᵗ Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  Rochester, New York
        May <u>30</u>, 2007.